This case involves the disposition of the estate of C.M. Smith, a resident of Washington County, who died testate. The first question presented is whether the trial judge erred when he ordered the sale of a tract of real estate devised under the will and further ordered that the proceeds of that sale be distributed equally between the brothers and sisters of C.M. Smith, even though C.M. Smith's will appears to provide for a different disposition. The second question presented is what assets of the estate are to be used by the executrix for the payment of debts, claims, and expenses of administration of the estate? We affirm in part, reverse in part, and remand.
 Facts and Procedural History
C.M. Smith ("the decedent") died on February 5, 1996. His wife, Iva J. Smith, who was named as executrix in the decedent's will, died soon after on February 19, 1996. On February 5, 1998, Ann Muchia, who was named as successor executrix to Iva Smith, filed a petition to admit the decedent's will to probate.
Portions of the will read as follows:
"ARTICLE I
 "I hereby direct my executor hereinafter named to pay all of my just debts, funeral expense and the cost of administering my estate out of my estate as soon after my death as may be practicable.
"ARTICLE II
 "I give, devise and bequeath unto my beloved wife, Iva J. Smith, a life estate in the property owned by me and described as follows: . . . containing 19.83 acres more or less; together with the use and benefit of said land during her lifetime.
". . . .
"ARTICLE III
 "In the event my wife, Iva J. Smith, should predecease me, and in any event, on the natural expiration of her life estate, *Page 87 
the above described land shall pass to the following people: Carl Smith, Myrtie Mills, Gordy Smith, Ann Muchia, Lena Caten, and Lora Reed, all being my brothers and sisters.[1] This property is to be divided in the following manner:
 "CARL SMITH shall be given five (5) acres exactly from that portion of the land on which the mobile home and outbuildings lie, and the said mobile home and outbuildings shall be his own.
 "MYRTIE MILLS shall be given an equal interest out of the remainder of the land from that portion of the land that adjoins the property which she currently owns.
 "The remainder of the property is to be divided between Gordy Smith, Ann Muchia, Lena Caten and Lora Reed as they see fit, but in equal shares, share and share alike.
 "It is my desire that no timber be cut, sold or otherwise disposed of from this property.
 "Further, it is my desire that this property not be sold to anyone outside the family."
On August 7, 1998, the probate court ordered that the will be admitted to probate and granted letters testamentary under the will to Muchia. On May 7, 1999, Muchia filed a petition to remove the estate from the probate court to the Circuit Court of Washington County, and on May 11, 1999, the circuit court granted the petition to remove the estate, and, in due course, the proceeding was transferred to the circuit court. On July 14, 1999, Muchia petitioned for the sale of the real property. In the petition, Muchia alleged that there were insufficient funds in the estate to pay the "claims, debts and costs of administration of the estate," and that it was in the best interest of the estate that the property be sold to pay those claims, debts, and costs and that the proceeds remaining after the claims, debts, and costs of administration of the estate were paid should be distributed equally among the "joint owners of the real property." On August 24, 1999, the trial judge held a hearing on the petition.
At the August 24, 1999, hearing, Muchia testified that the only assets of the estate were a tract of real estate of approximately 20 acres, on which was situated a 1969 mobile home with a detached garage, and approximately $1,375, which she realized from the sale of the decedent's automobile. She also testified that at the time of his death, C.M. Smith had a joint bank account with his wife, Iva, in which there was $41,000. She further testified that after C.M. Smith's death a niece who lived in California had come to Alabama and had put Iva in a hospital in Mobile, where Iva died; that the niece had then taken the proceeds of the account to California; and that Muchia had been unable to recover any of those funds. Muchia also testified that the decedent did not have any debts at the time of his death and that the only debts of the estate at the time of the hearing were for the costs and expenses for the administration of the estate. Muchia further testified that of the six brothers and sisters named in the will, only she and Gordy Smith were still living.
On December 10, 1999, the heirs of Carl Smith, a specific devisee in the will — Bobby Smith, Rachel Carpenter, Helen Loper, and Ethel Virginia Smith (hereinafter referred to as "the heirs of Carl Smith") — answered the petition and objected to the sale of the land. They stated: *Page 88 
 "[U]nder the terms of the Last Will and Testament, Carl Smith was devised five (5) acres of the lands owned by C.M. Smith, deceased, to be located `exactly from that portion of the land on which the mobile home and outbuildings lie, and the said mobile home and outbuildings shall be his own.' That a general sale of said real property involving the five (5) acres devised to Carl Smith would not take into account the value of said five (5) acres as opposed to the remaining property devised to other devisees under said Last Will and Testament to allow for a fair and proper distribution of the payment of the proceeds after payment of all debts, claims and costs of administration. [The heirs of Carl Smith] would further allege that said five (5) acres have not been delineated by survey nor appraised."
In addition, the heirs of Carl Smith filed a counterclaim seeking a judgment declaring that under the will they are entitled to have the five acres of land on which the mobile home and outbuildings lie set aside for them.
On March 21, 2000, Marguerete Williams, a descendant of Lena Caten and a niece of the decedent's, filed an answer to Muchia's petition for the sale of the real property. In her answer, Williams alleged that the language of the will concerning the property was "inexact and subject to interpretation." Williams requested that the court set a hearing so that "the terms of the Last Will and Testament of C.M. Smith, deceased, can be fully and fairly discerned, and that this Honorable Court may then order such relief as may be just and proper." On August 9, 2000, Williams filed a "response to petition for sale of real property," alleging that the estate did not have adequate cash to pay its obligations and that the real property could not be equitably divided and that the "only equitable means by which this Court can follow the intention of C.M. Smith is to order the sale of the only asset of the Estate, payment of expenses and division of the proceeds." She offered to purchase the real property for $60,000, and she requested that Muchia file an inventory of the estate. On August 31, 2000, the trial judge ordered that a hearing be held on November 21, 2000. At the November 21 hearing, Rachel Carpenter, a daughter of Carl Smith and one of the heirs, testified that her father had lived on the property with C.M. Smith for approximately 10 years.
On January 23, 2001, the heirs of Carl Smith filed a proposed settlement with the court, pursuant to which the timber from the entire tract of real property would be sold to pay the debts and expenses of the estate and the balance of the proceeds from the sale of the timber would be divided "among the heirs of C.M. Smith, per stirpes and not per capita, as if he died intestate." As part of the settlement, the heirs of Carl Smith would be deeded a five-acre tract containing the mobile home and outbuildings, according to a proposed survey. On February 5, 2001, Williams filed a motion opposing the proposed settlement.
The trial court did not accept the settlement, and the case was set for a bench trial on August 21, 2001.
At that trial, John Russell Wilson, a real estate appraiser and broker testified that he had appraised the real estate in two parcels. One parcel contained 5 acres and the improvements, i.e., the mobile home and the outbuildings, which the heirs of Carl Smith "surveyed out of the twenty acre parcel," and the second parcel consisted of the remaining land, approximately 15 acres. Wilson valued the 5-acre parcel at $40,000 and the 15-acre parcel at $18,000, as of August 15, 2001. Neither appraisal included the value of the timber on the *Page 89 
land. Under cross-examination, Wilson testified that he did not know how the composition of the 5-acre tract had been decided, but that that tract was in the middle of the property, and he did not consider the irregular shape of the remaining 15-acre tract in his appraisal of that tract.
Robert Nelson, a consulting forester, testified that the timber on the entire 20 acres was worth $41,916. Nelson had valued the land and the timber in 1999, and his original appraisal, dated April 28, 1999, estimated the total value of the 20 acres to be $74,366. Of that figure, $51,766 was allocated to the timber and $22,600 to the "bare land." As Nelson stated in the original appraisal, his original appraisal of the land did not include the value of the mobile home and unattached garage, and he testified that he estimated that there was more timber per acre on the 15-acre parcel than on the 5-acre parcel.
Judge Thomas Baxter, district judge of Washington County, testified that he drafted C.M. Smith's will when he was practicing law. He testified as follows:
 "Q. All right. And what instruction did [C.M. Smith] give you concerning the preparation of his will?
 "A. He indicated to me that he wanted to leave the five-acre parcel of land to a brother where there were some buildings located. And so based on those instructions, I drafted that portion of the will that dealt with that. There were other things that he talked to me about, as well, which are also found in the will, but I did it based on his instructions to me.
". . . .
 "Q. All right. And in the preparation of that will, did you attempt to carry out the intent of Mr. Smith?
"A. Yes, sir.
 "Q. All right. And when he read the will, was he satisfied with it?
"A. Yes, sir, . . . ."
On April 29, 2002, the trial court issued its order; that order stated, in part, as follows:
 "The court is of the opinion after reviewing the Will of the decedent and the evidence offered in this case that it is in the best interest of the Estate and the beneficiaries under the Will of the decedent that the entire twenty (20) acre tract should be sold as hereinafter ordered.
 "The Court is of the further opinion after consideration of all the evidence that the allegations of the petition for the sale of the real property described in the petition and filed by Ann Muchia, individually and as the duly appointed Executrix of the Estate of C.M. Smith, deceased, are true and that said petition should be granted. It is therefore,
 "Ordered, Adjudged and Decreed by the Court that the petition for the sale of real property heretofore filed in this cause by Ann Muchia, individually and as the duly appointed Executrix of the Estate of C.M. Smith, deceased, be and the same hereby is granted. It is further,
 "Ordered, Adjudged and Decreed by the Court that the real property described in Exhibit `A' of said petition be sold by the Executrix of the Estate of C.M. Smith for the payment of the claims, debts, costs and expenses of administration at public sale. . . .
". . . .
 "Bobby Smith, Rachel Carpenter, Helen Loper and Ethel Virginia Smith, being all of the heirs at law of Carl Smith, deceased, filed an Answer and Counterclaim for Declaratory Judgment to the petition of Ann Muchia, as Executrix *Page 90 
under the Will of C.M. Smith, deceased, for the sale of the . . . real property for the payment of claims, debts and costs of administration. In their Answer and Counterclaim for Declaratory Judgment, the heirs of Carl Smith contend that the Court should set aside to them five (5) acres of the land owned by C.M. Smith, deceased, and described in the petition `exactly from that portion of lands upon which the mobile home and outbuildings lie and the said mobile home and outbuildings shall be his own,' and further contending that a sale of the entire twenty (20) acre tract of real property would involve the five (5) acres devised to Carl Smith and would not take into account the value of this five acres as opposed to the remaining part of the twenty (20) acre tract devised to the other beneficiaries of the Will of C.M. Smith, deceased.
 "The intent of the Testator, C.M. Smith, is to be gathered from the whole instrument. The intent of the Testator is the polestar in the construction of a Will. The Court has reviewed the whole Will of C.M. Smith, deceased. Under Article I of the Will of C.M. Smith, the testator provided for the payment of all of his just debts, funeral expense and the cost of administering his estate out of his estate as soon after his death as practicable. In Article II of the Testator's Will, he bequeathed to his beloved wife, Iva J. Smith, a life estate in the property owned by him and which is the twenty (20) acre tract described above. This bequest to the decedent's wife is in clear and unequivocal terms. In Article III of the Testator's Will, the Testator provided that upon the natural expiration of the life of his wife, Iva J. Smith, the said twenty (20) acre tract should pass to his six brothers and sisters. This bequest is in clear and unequivocal terms. Under the clear and unequivocal terms of the Testator's Will, at this point, he devised to his wife, Iva J. Smith, a life estate in the . . . land with the remainder over jointly to his six brothers and sisters.
 "Up until the time of the death of the Testator's wife, Iva J. Smith, the six brothers and sisters were devised no possessory interest. After devising a life estate to his wife, Iva J. Smith, with the remainder over jointly to his six brothers and sisters, the Testator then attempted to direct how this remainder interest would be divided between his six brothers and sisters.
 "This directive by the Testator is unclear and is in conflict with the clear and unequivocal terms of the Testator's Will. The Court is of the opinion that this directive by the Testator as to how this twenty (20) acres is to be divided between the Testator's six brothers and sisters cannot in equity and fairness to the beneficiaries be followed.
 "This twenty (20) acres of real property, or some portion thereof must be sold in order to pay the claims, debts, costs, and expenses of administration. The Court cannot determine from the evidence before it what portion would be sold to pay the claims, debts, costs, and expenses of administration. The Court cannot set aside five (5) acres of this twenty (20) acre tract to the heirs of Carl Smith and sell the remaining part of this tract without frustrating the intent of the Testator that all six of his brothers and sisters would receive a share of this twenty (20) acre tract, nor would this be an equitable resolution of this issue. Additionally, the Court cannot determine if the sale of the balance of the twenty (20) acre tract, after deducting the five (5) acre tract asked for by the Carl Smith heirs would generate sufficient cash to pay the claims, debts, *Page 91 
costs, and expenses of administration. Therefore, the Court has determine[d] that a sale of the entire twenty (20) acre tract is necessary and is in the best interest of all the beneficiaries under the Will of the decedent and would give effect to [the] clear intent of the Testator.
 "In any event a division between the beneficiaries under the will of the decedent is not necessary in this Court's opinion because the Court has determined that it is necessary in order to pay the claims, debts and costs of administration that this entire twenty (20) acre tract be sold as one parcel and that it is in the best interest of the estate that the entire twenty (20) acre tract . . . be sold for the purposes aforesaid. The Court is, therefore, of the opinion that under the terms of the Will of the decedent, the Court cannot in equity and fairness to all beneficiaries divide this twenty (20) acre tract of real property in accordance with the Testator's directive. The Court is of the further opinion that the rule of selection does not apply in this case and that the heirs of Carl Smith are not entitled to have set aside to them five (5) acres out of the aforesaid twenty (20) acre tract on which the mobile home and buildings lie. . . .
". . . .
 "It also appears to the Court from the answer filed by the heirs of Carl Smith to the petition for the sale of the real property owned by the decedent at the time of his death, that the heirs of Carl Smith contend that in the event of the sale of said real property they would be entitled to a disproportionate share of the sale proceeds. The Court does not know at this point what the sales price of the twenty (20) acre tract will be and if there will be any balance remaining of the sales proceeds after the payment of the claims, debts, costs and expenses of administration to be divided among the beneficiaries of the Will of the decedent. The Court is of the opinion, however, that should there be any balance remaining of the sale proceeds after the payment of the claims, debts, costs and expenses of administration it should be divided equally between the decedent's six brothers and sisters, or their decedents."
(Emphasis added, except emphasis on the word "must," which is original.)
The heirs of Carl Smith appeal to this Court, raising three issues.[2]
First, the *Page 92 
heirs of Carl Smith allege that the trial court should have found the language of the will sufficient to set aside for them a five-acre parcel containing the mobile home and the outbuildings. Second, the heirs of Carl Smith allege that the trial court should not have ordered a sale of the real estate when they had offered to pay a pro rata share of the debts, the costs of administration, and the expenses of the estate. Third, the heirs of Carl Smith contend that if the property is sold, they should receive a larger share of the proceeds of the sale because the will had made a specific devise of five acres to Carl Smith, which was a larger share of the real estate than was given to the other heirs.
 Standard of Review
This case was tried without a jury. In Allstate Insurance Co. v.Skelton, 675 So.2d 377 (Ala. 1996), this Court stated:
 "When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error. Griggs v. Driftwood Landing, Inc., 620 So.2d 582
(Ala. 1993); First National Bank of Mobile v. Duckworth, 502 So.2d 709 (Ala. 1987). However, where the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court's judgment carries no presumption of correctness. Beavers v. County of Walker, 645 So.2d 1365 (Ala. 1994). Because no material facts are disputed and this appeal focuses on the application of the law to the facts, no presumption of correct[ness] is accorded to the trial court's judgment. Therefore, we review de novo the application of the law to the facts of this case. Beavers, supra; Lake Forest Property Owners' Ass'n v. Smith, 571 So.2d 1047 (Ala. 1990)."
675 So.2d at 379. In Reed v. Board of Trustees for Alabama StateUniversity, 778 So.2d 791 (Ala. 2000), this Court stated:
 "`The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.' Hall v. Mazzone, 486 So.2d 408, 410 (Ala. 1986). The rule applies to `disputed issues of fact,' whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala. 1995). The ore tenus standard of review, succinctly stated, is as follows:
 "`[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.'
"Raidt v. Crane, 342 So.2d 358, 360 (Ala. 1977)."
778 So.2d at 795.
In this case, the facts before the trial court are essentially undisputed, and the controversy involves questions of law for this Court to consider; consequently, the trial court's judgment carries no presumption of correctness. Beavers v. County of Walker, 645 So.2d 1365
(Ala. 1994), and Allstate Ins. Co. v. Skelton, 675 So.2d 377 (Ala. 1996). Our review is de novo. Beavers, supra; Lake Forest PropertyOwners' Ass'n v. Smith, 571 So.2d 1047 (Ala. 1990).
 I.
The heirs of Carl Smith argue that "the language in the will that Testator is leaving *Page 93 
the twenty (20) acre tract of land to his brothers and sisters is not controlling since he immediately delineates how and what portions he is leaving to each of his brothers and sisters." (Brief of Heirs of Carl Smith, p. 14.) They further argue:
 "The designation in C.M. Smith's will that the described land shall pass to his six brothers and sisters was descriptive only and should not be used to overrule the definitive language that his brother, Carl Smith, 'shall be given five (5) acres exactly from that portion of land [on] which the mobile home and outbuildings lie and said mobile home and outbuildings shall be his own.'"
(Brief of Heirs of Carl Smith, p. 13; emphasis in original.) Muchia counters:
 "[T]he testator initially and in clear and unequivocal terms devised to his wife, Iva J. Smith, a life estate in the 19.83-acre tract of real property described in Article II of his will. Secondly, he clearly and unequivocally provided that upon the death of his wife the remainder interest in the real property would go jointly to his six brothers and sisters. Thirdly and in direct conflict with his earlier pronouncement, which is the source of our present dispute, he directed that the remainder interest in the real property should be specifically divided among his siblings according to his dictates."
(Muchia's brief, p. 9.) Williams, a niece of Lena Caten who filed a brief as an interested party in support of Muchia, argues that:
 "C.M. Smith clearly and unequivocally devised the subject property to his six brothers and sisters. C.M. Smith then directed that the property be divided in a particular and unclear manner, carving out five acres which are undefined to Carl Smith and giving an `equal interest' to Myrtie Mills.
 "What the heirs of Carl Smith ask this Court to do is to assume that C.M. Smith made a mistake in the general conveyance of the subject property to the six brothers and sisters by giving effect to their construction of the specific terms of the directions following."
(Williams's brief, p. 7.)
In Born v. Clark, 662 So.2d 669 (Ala. 1995), this Court stated:
 "It is well settled in Alabama that the intention of the testatrix is the law of the will, which the court should consider as a whole, giving effect to each provision where it is possible to do so; it is the court's duty to carry out the testatrix's intention where that intent can be ascertained. To determine the intent of a testator or testatrix, the court must look to the four corners of the instrument, and if the language is unambiguous and clearly expresses the testator's or testatrix's intent, then that language must govern. Galin v. Johnson, 457 So.2d 359 (Ala. 1984). Where a will contains ambiguous or doubtful expressions, it is the duty of the court to determine what the testator or testatrix intended. Brittain v. Ingram, 282 Ala. 158, 209 So.2d 653 (1968)."
662 So.2d at 671.
Muchia and Williams argue that the phrase in Article III of the will, "shall pass to the following people," conflicts with language in the following paragraph leaving five acres of real property to Carl Smith. The logical presumption of their argument is that the phrase leaves the property to the six named individuals in equal shares, share and share alike, and is controlling, and that the following paragraphs, which make specific devises, therefore conflict with the general provision. We cannot accept this argument. *Page 94 
It is apparent that the testator clearly intended to leave his real property to his brothers and sisters. In the sentence following the devise of the property to his siblings, the testator states: "This [real] property is to be divided in the following manner." The testator's intent, in our opinion, is clear. All six brothers and sisters are to share in the real property in the following manner: Carl Smith is to receive five acres first, then another five acres is devised to Myrtie Mills,[3] and the remaining acreage goes to the remaining four brothers and sisters, "in equal shares, share and share alike."
The trial court erred when it held that "[t]his directive [to give Carl Smith and Myrtie Mills five acres each] by the Testator is unclear and is in conflict with the clear and unequivocal terms of the Testator's Will," and that "this directive by the Testator as to how this twenty (20) acres is to be divided between the Testator's six brothers and sisters cannot in equity and fairness to the beneficiaries be followed."
The language of the will was sufficient to set aside a five-acre parcel for Carl Smith; the trial judge erred in finding otherwise. We leave it to the sound discretion of the trial court to decide the boundaries of the five-acre tract to be set aside for the heirs of Carl Smith, being guided by the principles set out in Horn v. Peek, 246 Ala. 241,20 So.2d 234 (1944) (where the plaintiff was given 64 acres out of a tract of 179 acres and the balance was given to defendants, the plaintiff and the defendants had a right to make a selection, which could be done only under the supervision of the court so as to make each tract a compact body with straight lines for boundaries and in proper proportionate value according to the equities of the situation). In carving out the five-acre tract, the trial court may consider all of the evidence already presented, including the survey, but, in any event, the five-acre tract must encompass the mobile home and the outbuildings, which, according to the record before us, still exist.
 II.
The heirs of Carl Smith argue that they offered to pay their pro rata share of the expenses of the estate, and that "[t]o allow the heirs of Carl Smith to retain ownership of the five (5) acres and pay their pro rata share of all costs would have been equitable and would not be unfair to the remaining devisees." (Brief of Heirs of Carl Smith, p. 18.) The heirs cite no authority to support this position except for cases dealing with general equitable principles of fairness. They argue:
 "The heirs . . . wanted to save the five (5) acres devised to Carl Smith from sale because they had been looking after the place and this land had been owned by their grandfather. The remaining devisees of the fifteen (15) acres of property owned by the Estate of C.[M]. Smith could not in any way be damaged and their rights would not have been prejudiced by allowing the heirs of Carl Smith to save their five (5) acre parcel from sale by paying their pro rata share of the costs and expenses of administration."
In deciding this case, we must obviously consider the expenses of the administration of the estate. As of August 24, 1999, the attorney fees of the estate were estimated to be $5,000. Since that time, there has been considerable litigation, and *Page 95 
presumably those expenses have increased. Muchia argues that
 "[t]he devolution of title to a decedent's real property is subject to administration, under the dictates of § 43-2-830[(c), Ala. Code 1975]; the court upon review of the facts of the case had the authority to determine that sale of the entire 19.83 acre tract was necessary for the swift settlement of C.M. Smith's estate. First, . . . the last will . . . had directed his executrix Ann Muchia to pay the cost of administering his estate out of his estate `as soon after [his] death as may be practicable'. . . . Second, the trial court could not assure that enough cash would be generated to pay the claims, debts, costs and expenses of administration through the sale of only a portion of the 19.83 acres of real property, especially in light of the fact that timber prices had dropped dramatically since the appraisals were made."
(Muchia's brief, p. 16.) We cannot accept this argument. The record shows that the heirs of Carl Smith have agreed to pay their pro rata share of the costs and expenses of the administration of the estate in order to have the 5-acre tract set aside; therefore, we hold that the trial judge is authorized to order the sale of the remaining approximately 15 acres and divide the proceeds among C.M. Smith's remaining 5 brothers and sisters, or their heirs, per stirpes. The heirs of Carl Smith must pay their pro rata share of the expenses of the administration of the estate, to be determined by the ratio the value of the five-acre tract bears to the value of the entire tract devised under the will.[4]
 III.
Finally, the heirs of Carl Smith argue that the trial court erred in its order when it stated that "should there be any balance remaining of the sale proceeds after the payment of the claims, debts, costs and expenses of administration it should be divided equally between the decedent's six brothers and sisters, or their decedents."
Because we have ordered that a five-acre tract shall be set aside for the heirs of Carl Smith, this issue has been rendered moot.
In view of the fact that it is undisputed that the claims, debts, and costs of administration must be paid before the proceeds of any sale are distributed, the trial court shall follow the order of abatement, as follows: (1) residual personalty, of which there appears to be $1,375 in cash; (2) personal property generally bequeathed (there appears to be none); (3) personal property specifically bequeathed, ratably (there appears to be none); (4) then general devises (there appear to be none); and finally (5) specific devises of land. See Rowe v. Newman, 290 Ala. 289,276 So.2d 412 (1972), and Festorazzi v. First Nat'l Bank of Mobile,288 Ala. 645, 264 So.2d 496 (1972).
Because we have determined that the total acreage was intended to be devised specifically, each devisee shall be obligated to pay the pro rata share he or she receives to pay the claims, debts, and costs of administration, ratably.[5]
We leave it to the trial court, exercising its sound discretion, to make its determination, *Page 96 
in accordance with this opinion, whether to conduct a private or public sale of the remaining 15 acres and whether to apply the principles of law set out in § 35-6-100, Ala. Code 1975,[6] should any of the parties desire to make an offer to purchase the 15 acres.
This opinion was prepared by retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala. Code 1975.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Moore, C.J., and Houston, See, Lyons, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
[1] The record shows that at a hearing held on August 24, 1999, Muchia testified that of the six brothers and sisters named in the will, all had died except for Muchia and Gordy Smith.
[2] The heirs of Carl Smith raised a fourth issue — whether the trial court may order the sale of real estate to pay for the costs of administration of the estate where the decedent had no debts on the date of death. The heirs of Carl Smith argue that Turley v. Hazelwood,234 Ala. 186, 174 So. 616 (1937), and Beadle v. Steele, 86 Ala. 413,5 So. 169 (1888), interpret § 43-2-441, Ala. Code 1975, to mean that "the lands of the decedent may be sold for debts owing by the decedent at the time of his death but not for cost and expenses of administration, when no debts are shown for the payment of which the lands are liable."
Muchia argues that § 43-2-441, Ala. Code 1975, was rendered obsolete by the adoption of § 43-2-844, Ala. Code 1975, which became effective for estates filed for probate on or after January 1, 1994, see § 43-2-853, Ala. Code 1975. Muchia argues that this Court's restrictive definition of debts in Turley v. Hazelwood, supra, and Beadlev. Steele, supra, no longer applies to § 43-2-844.
Without deciding the merits of either argument, we note that this argument was not presented to the trial court, and we decline to consider it. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992), in which this Court stated:
 "[T]he record shows that [the appellant] did not raise this issue in the lower court. This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial Court. Rodriguez-Ramos v. J. Thomas Williams, Jr., M.D., P.C., 580 So.2d 1326 (Ala. 1991)."
[3] We note that the issue whether the heirs of Myrtie Mills are to receive the five acres devised to Mills has not been argued to this Court, nor was it argued to the trial court; that issue is, therefore, not before us. Consequently, we leave undisturbed that portion of the trial court's order in which the heirs of Myrtie Mills are to receive Mills's pro rata share of the proceeds of the sale of the 15 acres.
[4] See Cater v. Howard, 230 Ala. 133, 138, 159 So. 830, 834 (1935), in which this Court stated:
 "While it may be conceded that the property, both real and personal, not specifically devised may be charged with the payment of debts so as to relieve the property specifically devised from the burden, nevertheless property so specifically devised is not wholly relieved, and must contribute ratably to the payment of the debts. May et al. v. Burns, [222 Ala. 68, 131 So. 232 (1930)]."
[5] In view of the fact that there are two appraisals in the record before this Court, appraising a 5-acre tract as well as the 19.83-acre tract as a whole, the trial judge may use this evidence in determining the pro rata share of the expenses the heirs must pay, but he may take additional testimony to determine what the pro rata share would be.
[6] This Court has held that the purpose of § 35-6-100 is to allow cotenants who wish to preserve their property intact, which was the desire of the testator as expressed in the will, to purchase the interests of any cotenants wishing to sell the property for a division of the proceeds and thereby to prevent the passing of title to family land to a stranger at a forced sale. See Williams v. McIntyre, 632 So.2d 446,449 (Ala. 1993), where this Court, citing McGee v. McGee, 495 So.2d 1081
(Ala. 1986), Black v. McCorvey, 428 So.2d 607 (Ala. 1983), and Raglandv. Walker, 387 So.2d 184 (Ala. 1980), held that "[t]he legislature did not intend, however, to keep title from passing to a stranger at the cost of selling the property at a lesser value," but noted that "Section35-6-100 does not prohibit a joint owner from buying the interests of the other owners and subsequently selling the property to a `stranger.'"