Rel: March 20, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

————————————————

### CL-2025-1091

————————————————

### F Family South, LLC

### v.

### Property Owners Association of Ono Island, Inc.

### Appeal from Baldwin Circuit Court
### (CV-19-901602.80)

EDWARDS, Judge.

F Family South, LLC ("FFS"), appeals from a judgment entered by the Baldwin Circuit Court ("the trial court") determining that the Property Owners Association of Ono Island, Inc. ("the POA"), could, pursuant to Ala. Code 1975, §§ 40-10-82 and 40-10-83, redeem a parcel of

real property that had been purchased by Duong Hoang at a 1995 tax sale, which parcel had subsequently been transferred to FFS. This is the second appeal arising from the underlying proceedings. See F Family South, LLC v. Property Owners Ass'n of Ono Island, Inc., 403 So. 3d 812, 814 (Ala. 2024). The facts and procedural history were set out in our supreme court's opinion:

"Ono Island is a natural barrier island in Baldwin County. In 1969, Ono Development Company, Inc. ('Ono Development'), began developing Ono Island into a single-family residential subdivision. In September 1970, it filed a 'Declaration of General Covenants and Restrictions Applicable to Ono Island Subdivision' ('the general covenants'). The general covenants expressed both Ono Development's intention to create 'a community with ... canals ... and other common areas and common facilities for the benefit of [the Ono Island] community' and its desire 'to provide for the preservation of the values and amenities ... and for the maintenance of said ... canals ... and other common areas and common facilities.' The general covenants further explained that Ono Development had formed the POA 'for the ... preservation of the values and amenities in said community.' The general covenants defined '[t]he Properties' to which they were intended to apply as including 'all those parts of Ono Island ... of which a plat of subdivision, duly recorded has been executed by Ono Development ... or to which Ono Development ... has given its approval ... and such additions thereto.' They excluded from that definition '[l]ands not included within the perimeter boundaries of a recorded plat executed or approved by Ono Development ... unless and until the same are annexed.' The general covenants further created an Architectural Control Committee ('the ACC') and granted it the power to permit or approve construction and

2

maintenance of all structures upon the properties subject to the general covenants and/or adjacent waters. Finally, the general covenants explained that portions of Ono Island, following future development, could also be subject to additional '[l]ocal [c]ovenants and [r]estrictions.'

"In 1981, Ono Development secured a permit from the U.S. Army Corps of Engineers ('the Corps') authorizing its construction of a series of inland canals on Ono Island intended to provide water access to interior lots that would front on the canals and were slated for development. It is undisputed that the subsequent canal excavation resulted in the creation of, among others, [the parcel of real estate at issue in this case,] an unnamed, undeveloped 'intertidal mound' or island ('the island') at the intersection of two of the planned canals designated as 'Canal B' and 'Canal B-1.'[1] The nature and current ownership of the island is at the heart of the parties' dispute. According to the POA, the island, as an intertidal mound, was intentionally 'planned and constructed near the center of said canals' as 'an essential component of the Ono Island Canal System,' which, it maintains, was permitted for construction by the Corps and was expected to continue in use contingent upon perpetual monitoring and maintenance of water quality and stability.

"....

"In 1987, Ono Development conveyed to Randall L. Patterson for subdivision and development a parcel of property that was contiguous to the lots in Unit 14[, a group of residential lots fronting Canal B or C and B-1,] and joined the Unit 14 lots at the centerline of Canal B and Canal B-1; this parcel included the island. The deed specifically referenced and made applicable to the property conveyed to Patterson, which, again, included the island, both the recorded local covenants applicable to Unit 15, [another group of residential lots,] specifically, and the general covenants. In 1993, Patterson conveyed, again subject to those covenants,

3

the property he had received via the 1987 deed to Ono-St. John, Inc. ('Ono-St. John'). At or around that time, Ono-St. John recorded a plat creating the Ono-St. John Subdivision on the parcel. The legal description on the plat apparently omitted certain property transferred to Patterson by the 1987 deed -- including the island (i.e., the island does not appear on the recorded plat). Again, a corresponding 'Declaration of Local Covenants and Restrictions Applicable to Ono-St. John Subdivision' recorded at that time reflected that the Ono-St. John Subdivision was subject to and burdened by the general covenants and by the local covenants applicable to the Ono-St. John Subdivision.

"Following the 1987 transfer to Patterson and by at least 1991, the island was, in apparent keeping with the standard operating procedure of the Baldwin County Revenue Commissioner, assigned an identifying parcel number for tax purposes and was to be assessed for ad valorem property taxes. Ono-St. John was formally dissolved in October 1993. In 1995, as the result of Ono-St. John's failure to pay the 1994 annual ad valorem taxes on the island, the revenue commissioner purportedly sold the island to Duong Hoang, a nonparty to this action. ….

"In 1998, Ono Island Canal Owners Association, Inc. ('the COA'), a nonprofit corporation, was organized for the primary purposes of 'maintain[ing] and improv[ing] the canal system in the Ono Island Subdivision.' As defined in the COA's articles of incorporation, its membership included all owners possessing fee-simple title to a lot contiguous to one of the canals within the canal system. Ono Development subsequently assigned to the COA administration of the canals and transferred to the COA the assets and responsibilities of a trust initially created for that purpose.

"Hoang obtained a tax deed to the island in 1998. In 2015, a new entity called 'Ono-St. John, Inc.' ('OSJ') was formed;[2] OSJ purchased the island from Hoang. …

4

"In 2016, OSJ applied to the Corps for a permit to construct on the island a boat shelter and walkways. In May 2019, OSJ obtained, over the objections of the POA, the COA, the ACC, and nearby property owners, the requested permit allowing it to construct 'an incised boat slip and boat shelter' on the island and then entered into a related construction contract.[3] OSJ then transferred both the island and the permit to FFS.

"In October 2019, when construction work on the planned boat shelter ostensibly began, the contractor was initially approached by and later received a 'Stop Work Order' from the ACC informing FFS that construction work was not permitted within the canal system without the prior approval of the ACC and the COA. As a result, FFS filed in November 2019 a verified complaint against the POA in the Baldwin Circuit Court seeking, among other remedies, various forms of injunctive relief. In that complaint, FFS contended that the POA lacked 'jurisdiction' over the island, that FFS would be irreparably harmed if the stop-work order was permitted to stand, that it lacked an adequate legal remedy, and that it had a reasonable chance of succeeding on the merits. Accordingly, FFS sought the entry of a temporary restraining order followed by more permanent injunctive relief. In addition, FFS's complaint included claims of contractual interference and negligence, as well as related demands for compensatory and punitive damages.

"The POA filed an answer and counterclaim.[4] The POA maintained that the island was subject to restrictions, including the general covenants and/or the local covenants applicable to Unit 14 and Unit 15. Accordingly, it contended that no pier or boathouse could be constructed without the review and approval of the ACC, whose rules provided building and shoreline specifications applicable to any proposed boathouse and prohibited building on any of the intertidal mounds within the canal system. The POA thus

5

asserted a counterclaim alleging that FFS had breached express and/or implied covenants that, it said, govern all canal-fronting lots and any intertidal mound located in the canal system. The POA's counterclaim also separately sought to void the 1995 tax sale of the island to Hoang and to invalidate FFS's title on the ground that the sale was invalid because it allegedly failed to comply with certain statutory requirements. In response, FFS asserted both that the claims in the POA's counterclaim were barred by the rule of repose and that the general covenants specifically excluded the island from their coverage.

"The POA later amended its counterclaim to further add that it had, on February 1, 2020, obtained, by means of a quitclaim deed from Ono-St. John,[5] title to the island and to assert a corresponding claim of its purported legal right of 'Redemption From Tax Sale' pursuant to § 40-10-83, Ala. Code 1975, in the event that the trial court declined to invalidate the tax sale pursuant to which FFS had obtained title. …

"FFS also later amended its complaint to add, among other additional counts, a request that the trial court 'remov[e] all clouds on' its title to the island and quiet title to the island in its name. In that amended complaint, FFS further contended that any purported right of redemption asserted by the POA was barred by both the doctrine of laches and the rule of repose.

"The case proceeded to an initial bench trial on the parties' equitable claims. ...

"....

"After trial, the trial court subsequently entered a 'Final Judgment' disposing of all pending claims in the POA's favor.[7] In particular, the trial court invalidated, based on the identified procedural deficiencies, the 1995 tax sale pursuant

to which FFS had obtained ownership of the island and declared the POA as the island's owner.
"_____

"[1]Various intertidal mounds are depicted on and specifically contemplated by the canal permit issued to Ono Development as 'filter mounds ... to reduce sheet flow into the canals.'

"[2]OSJ was apparently formed for the sole purpose of acquiring title to the island. It used the same name as the earlier, dissolved corporation mentioned above despite an apparent lack of any affiliation with that dissolved corporation.

"[3]OSJ did not seek a permit from the POA or the COA.

"[4]The COA and nine individuals owning property fronting the affected canals and located near the island also later successfully intervened in the action. Their claims, however, were not individually addressed below; instead, the trial court treated them as having been 'rendered moot' by its later judgment in favor of the POA. (Capitalization omitted.)

"[5]As noted above, the record indicates that Ono-St. John was dissolved in 1993. It is unclear how the POA obtained the referenced deed, which was executed in February 2020 by the former 'Secretary/Treasurer' of Ono-St. John.

"....

"[7]The trial court's judgment explained that it also resolved all of the parties' equitable claims and mooted the reserved legal claims."

F Family South, 403 So. 3d at 814-23.

In its opinion, our supreme court reversed, in part, the trial court's previous judgment in this case because, it determined, the POA's claim requesting that the 1995 tax deed be set aside was barred by the rule of repose. F Family South, 403 So. 3d at 825 ("The POA's challenge to the validity of the tax sale was extinguished by the rule of repose."). However, because the trial court had not considered whether the POA had the right to redeem the island pursuant to §§ 40-10-82 and 40-10-83 as it had requested, our supreme court declined to address that issue. Id.

Upon remand from our supreme court, the trial court directed the parties to file briefs on the issue of judicial redemption. After those briefs were submitted and considered, the trial court, on March 24, 2025, entered a judgment concluding that the POA was "entitled to effect a judicial redemption of the [island] from the [1995] tax sale," finding that the POA had tendered the amount required to redeem the island, divesting FFS of any right, title, or interest in the island, and declaring that the POA was the owner of the island.[1] The trial court amended its judgment on April 22, 2025, to correctly reflect the amount required for

---

[1]The trial court also denied any remaining claims asserted by FFS and declared that the claims of the intervenors had been mooted by the judgment in favor of the POA.

redemption of the island.  On May 1, 2025, FFS appealed the March 25,
2025, judgment, as amended, to our supreme court; on December 31,
2025, that court transferred the appeal to this court based on its
determination that the appeal is within this court's original appellate
jurisdiction.  See Ala. Code 1975, § 12-3-10; Coprich v. Jones, 406 So. 3d
58, 63 (Ala. 2024).

> "[W]here … the controversy involves questions of law for the
> court to consider, the court's judgment carries no presumption
> of correctness. Beavers v. County of Walker, 645 So. 2d 1365
> (Ala. 1994). Because … this appeal focuses on the application
> of the law to the facts, no presumption of correctness is
> accorded to the trial court's judgment. Therefore, we review
> de novo the application of the law to the facts of this case.
> Beavers, supra; Lake Forest Property Owners' Ass'n v. Smith,
> 571 So. 2d 1047 (Ala. 1990)."

Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996).

FFS first argues that the POA's redemption claim was barred by
the rule of repose.[2]  As noted, our supreme court applied the rule of repose

---

[2]Our supreme court has explained that "[t]he only circumstance
that will stay the running of the 20-year period of repose is a recognition
of the existence of the claimant's right by the party defending against the
claim." Boshell v. Keith, 418 So. 2d 89, 92 (Ala. 1982).  In its opinion in
F Family South, our supreme court indicated that the record contained
"no suggestion that the sole recognized exception to the rule of repose …
applies here."  403 So. 3d at 825 n.9.  We have also not been directed to
any such suggestion in the record.

to the POA's claim seeking to have the 1995 tax sale invalidated. F

Family South, 403 So. 3d at 825. Our supreme court explained the rule

of repose in Boshell v. Keith, 418 So. 2d 89, 91-92 (Ala. 1982):

> "Since McArthur v. Carrie's Admr., 32 Ala. 75 (1858), this State has followed a rule of repose, or rule of prescription, of 20 years. This principle of repose or prescription is similar to a statute of limitations, but not dependent upon one, and broader in scope. Scott v. Scott, 202 Ala. 244, 80 So. 82 (1918); Patterson v. Weaver, 216 Ala. 686, 114 So. 301 (1927). It is a doctrine that operates in addition to laches. Unlike laches, however, the only element of the rule of repose is time. It is not affected by the circumstances of the situation, by personal disabilities, or by whether prejudice has resulted or evidence obscured. Wilkerson v. Wilkerson, 230 Ala. 567, 161 So. 820 (1935); 30A C.J.S., Equity § 113 (1965), at p. 33. It operates as an absolute bar to claims that are unasserted for 20 years. Roach v. Cox, 160 Ala. 425, 49 So. 578 (1909). The rationale for this absolute bar to such actions was set forth in Snodgrass v. Snodgrass, 176 Ala. 276, 58 So. 201 (1912), as follows:
>
>> "'As a matter of public policy, and for the repose of society, it has long been the settled policy of this state, as of others, that antiquated demands will not be considered by the courts, and that, without regard to any statute of limitations, there must be a time beyond which human transactions will not be inquired into. It is settled that, after a period of 20 years, without any payment, settlement, or other recognition of liability, mortgages and liens will be presumed to have been paid, settlements will be presumed to have been made by administrators, trustees, agents, and other persons occupying fiduciary positions. It is necessary for the peace and security of society that there should be an end of litigation, and it is

10

inequitable to allow those who have slept upon their rights for a period of 20 years, after they might have demanded an accounting, and after, as is generally the case, the memory of transactions has faded and parties and witnesses passed away, to demand an accounting. The consensus of opinion in the present day is that such presumption is conclusive, and the period of 20 years, without some distinct act in recognition of the trust, a complete bar; and, as said in an early case, "the presumption rests not only on the want of diligence in asserting rights, but on the higher ground that it is necessary to suppress frauds, to avoid long dormant claims, which, it has been said, have often more of cruelty than of justice in them, that it conduces to peace of society and the happiness of families, 'and relieves courts from the necessity of adjudicating rights so obscured by the lapse of time and the accidents of life that the attainment of truth and justice is next to impossible.'" Harrison et al. v. Heflin, Adm'r, et al., 54 Ala. 552, 563, 564 [(1875)]; Greenlees' Adm'r v. Greenlees et al., 62 Ala. 330 [(1878)]; Nettles v. Nettles, 67 Ala. 599, 602 [(1880)]; Garrett v. Garrett, 69 Ala. 429, 430 [(1881)]; Semple v. Glenn, 91 Ala. 245, 260, 6 South. 46 [(1889)], 9 South. 265, 24 Am. St. Rep. 929 [(1891)]; Roach v. Cox, 160 Ala. 425, 427, 49 South. 578, 135 Am. St. Rep. 107 [(1909)].' (Emphasis supplied.) Snodgrass, at 176 Ala. 280, 281, 58 So. 201.

"The rule of repose or prescription is a defensive matter similar to, but broader than, a statute of limitation. Wilkerson, supra; Patterson, supra; 30A C.J.S., Equity § 113, at p. 33. Thus, it is unlike adverse possession, which affirmatively establishes title. The rule of repose has been described as '... a rule of property in this state, [and] tends to

11

the repose of society, and the quieting of litigation.' Spencer v. Hurd, 201 Ala. 269, 270, 77 So. 683, 684 (1918)."

As FFS contends, our supreme court applied the rule of repose to a claim seeking redemption of real property rights in Edmonson v. Colwell, 504 So. 2d 235 (Ala. 1987). The Edmonson court applied the rule of repose to bar claims seeking to redeem severed mineral interests more than 25 years after the sale of the mineral interests in a tax sale, stating:

"We have stated many times that the purpose of [Ala. Code 1975,] § 40-10-83[,] is to preserve the right of redemption without a time limit, if the owner of the land seeking to redeem has retained possession. Stallworth v. First National Bank of Mobile, 432 So. 2d 1222 (Ala. 1983); Tensaw Land & Timber Co. v. Rivers, 244 Ala. 657, 15 So. 2d 411 (1943). However, when the rule of repose or prescription has been raised in the pleadings (as it was in the instant case), we have stated:

"'We think the rule of prescription or repose is operative notwithstanding statements in opinions of this court to the effect that the owner invoking the aid of § 296, Title 51, Code of Alabama [1940], (see: § 3108, Code of 1923), may redeem at any time if he brings himself within the conditions and purview of this statute....

"'....

"'We do not think that the legislature in enacting Title 51, § 296, supra, and in the passage of antecedent statutes of the same import, had any intention of excluding the doctrine from application to proceedings under this redemption

12

statute, nor to disturb its application to belated proceedings to redeem by authority of this law. The rule has been applied so many times and has been the law of this state for so many years, we are unwilling to say that the legislature intended to except its application to proceedings here initiated and to others of like kind without a more definite expression to that effect.'

"Schwab v. Nonidez, 276 Ala. 308, 310-11, 161 So. 2d 592 (1964).

"The record conclusively establishes that the appellants did not attempt to redeem the mineral interests for more than 20 years. Therefore, the trial court did not err in barring the appellants' right to redeem under the rule of repose."

504 So. 2d at 237-38.

The POA argues that the rule of repose does not apply and relies on the fact that § 40-10-82 was amended in 2009 to explicitly state that "[t]here shall be no time limit for recovery of real estate by an owner of land who has retained possession." Former § 40-10-82 provided, in its entirety:

"No action for the recovery of real estate sold for the payment of taxes shall lie unless the same is brought within three years from the date when the purchaser became entitled to demand a deed therefor; but if the owner of such real estate was, at the time of such sale, under the age of 19 years or insane, he, his heirs or legal representatives shall be allowed one year after such disability is removed to bring an action for the recovery thereof; but this section shall not apply to any action brought by the state, nor to cases in which the owner of the real estate sold had paid the taxes, for the payment of

13

which such real estate was sold prior to such sale, nor shall they apply to cases in which the real estate sold was not, at the time of the assessment or of the sale, subject to taxation." After the 2009 amendment, § 40-10-82 provides in its entirety:

"No action for the recovery of real estate sold for the payment of taxes shall lie unless the same is brought within three years from the date when the purchaser became entitled to demand a deed therefor; but if the owner of such real estate was, at the time of such sale, under the age of 19 years or insane, he or she, his or her heirs, or legal representatives shall be allowed one year after such disability is removed to bring an action for the recovery thereof; but this section shall not apply to any action brought by the state, to cases in which the owner of the real estate sold had paid the taxes, for the payment of which such real estate was sold prior to such sale, or to cases in which the real estate sold was not, at the time of the assessment or of the sale, subject to taxation. There shall be no time limit for recovery of real estate by an owner of land who has retained possession. If the owner of land seeking to redeem has retained possession, character of possession need not be actual and peaceful, but may be constructive and scrambling and, where there is no real occupancy of land, constructive possession follows title of the original owner and may only be cut off by adverse possession of the tax purchaser for three years after the purchaser is entitled to possession."

As FFS contends, the 2009 amendment merely codified the law as it had been stated in caselaw for years preceding the amendment. See Edmonson, 504 So. 2d at 237; Giardina v. Williams, 512 So. 2d 1312, 1314 (Ala. 1987) ("Code 1975, § 40-10-83, has as its purpose the preservation of the right of redemption in the owner, within a time limit, if the owner

14

has retained possession."); <u>Gulf Land Co. v. Buzzelli</u>, 501 So. 2d 1211, 1213 (Ala. 1987) ("We have stated many times that the purpose of [Ala. Code 1975,] § 40-10-83[,] is to preserve the right of redemption without a time limit, if the owner of the land seeking to redeem has retained possession. This possession may be constructive or scrambling, and, where there is no real occupancy of the land, constructive possession follows the title of the original owner and can only be cut off by the adverse possession of the tax purchaser."); <u>see also</u> <u>O'Connor v. Rabren</u>, 373 So. 2d 302, 306 (Ala. 1979); <u>Moorer v. Chastang</u>, 247 Ala. 676, 26 So. 2d 75 (1946) (applying the same interpretation to the predecessor statute to § 40-10-83).[3] When the legislature enacts a statute and repeats a court decision's "critical language," the court follows the "history and precedent" that accompany that language. <u>Merck & Co. v. Reynolds</u>, 559 U.S. 633, 647, 648 (2010). As the supreme court observed in <u>Edmonson</u>, the law in effect at that time was that, "if the owner of the land seeking to redeem has retained possession," he or she enjoyed a "right of redemption without a time limit." 504 So. 2d at 237. Yet the <u>Edmonson</u>

---

[3]As FFS asserts, the language added to § 40-10-82 by the 2009 amendment closely mirrors the statement of the applicable law appearing in <u>Buzzelli</u>.

court determined that the rule of repose still operated to bar the plaintiff's claim for redemption after the passage of 20 years. Id. We are bound by our supreme court's pronouncement in Edmonson that the rule of repose operates to bar a claim for redemption that has not been asserted for 20 years, regardless of the lack of a statute of limitations on the redemption rights of an owner in possession of property sold at a tax sale. See Ala. Code 1975, § 12-3-16.

Under the law set out in Edmonson, we conclude that the rule of repose bars the POA's claim for redemption of the island. Because this issue is dispositive of the entire action, we need not consider FFS's other arguments for reversal of the trial court's judgment. See McGee v. Bevill, 111 So. 3d 132, 135 (Ala. Civ. App. 2012) (pretermitting an issue because of the dispositive nature of the decided issue). Accordingly, we reverse the judgment of the trial court and remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.